Good morning, Your Honor. Matthew Sirocco for Appellant Fredrick Mackie. If I may, I'd like to reserve two minutes for rebuttal. I think this case really stands or falls on the reliability of the tip that's at issue here, and so that's where I want to focus my attention. Of course, if the court has questions, I'm happy to answer them. And one of the things I want to point out is that Florida v. JL, which I think is really the case that Terry and Florida v. JL, this case, says specifically that the reliability of the tip includes the assertion of illegality that's involved. And this is where the tie-in with the Second Amendment issue that I threw in to get your attention applies. And that is, what is the assertion of illegality? Well, that's what's missing. The bare allegation that a person is in possession of a firearm, depending on state law, may or may not be illegal. In fact, under this, now we know, it can never be illegal under all circumstances. It is not contraband in the way that cocaine would be considered contraband under all circumstances. And so that's a relevant consideration. Well, what do we do with the fact, and there's just a fact, that California makes it illegal to have a concealed weapon absent a permit. And permits are very hard to get. And the chances of anybody on the street legally carrying a concealed weapon are very low. Well, I would say, one, actually, that the record doesn't support that. That may be colloquially known, but the record has no information about what percentage of people have concealed permit, concealed carry permits. But beyond that, the allegation wasn't that there was a concealed weapon. The allegation was that Mr. Mackey had a gun. Well, that's right. And it was not visible. Therefore, it was a concealed firearm. Well, actually, Officer Cunney could only see Mr. Mackey from behind. He couldn't see him from the front. That was his testimony. He didn't see where his hands were. He didn't see what he was wearing. So actually, and you may think that I'm slicing the apple thinly, but that's what's required here for the finding a reasonable suspicion. No, that's a sensible argument. No, I get it. Yeah. So there is really no allegation of a specific illegality. He's got a concealed weapon. I saw him brandish a weapon. I saw him take a gun out of his pocket and put it into his car without being in a locked box. All of these kinds of specific allegations that would automatically, in that case, I would say, give rise to at least enough information for the officer by itself to investigate further. Here we have the barest possible allegation you could have. He's got a gun. How do you know? I don't know. Did you see it? We don't know. When did you see it? I don't know. Where's the gun? I don't know. None of that information. But you're asking questions as if she said, I don't know. I don't know. No, the officers don't know. That's right. But she didn't say, I don't know. Because they didn't ask. Right. But if I'm the police chief and I've got a couple of officers who are flagged down on the street in the Tenderloin, do you remember the address? Golden Gate and Leavenworth. I drove past it on the way here. I was going to say, we've been there many times. I won't ask why. I work here, right? A woman flags me down, tells me that guy has a gun. The guy looks at me, looks at the conversation I'm having with the woman, and starts walking away rapidly. If I, the police officer, said, you know, I'm busy. I can't look into this. If I'm the police chief and I know that, I'm about to suspend that cop. Let me take issue with the factual basis of that hypothetical, which is that there wasn't actually any factual finding about whether Mr. Mackey started to walk afterwards or was already walking. And in fact, Judge Breyer specifically said, we don't know. He may have already been walking. So, and I think that's a relevant consideration because the government states that that's corroboration for the tip. And there was no factual finding on that matter. But to go to the heart of your question is, what should an officer do? Or in this case, two officers. What should two officers do under those circumstances? I think it's perfectly reasonable to say, ask at least one more question. Start off, take off after the suspect. Ask one question, two more questions. Where did you see it? Did you see it recently? Does he have it? Can I take a picture of your ID in case we need to call you later? Great. Goodbye. And we're on our way. 10 seconds, 15 seconds. All they need to do to establish a factual basis for reasonable suspicion. That's all that they're required to do. And I don't think that that's asking a lot. I think it's asking them to do the amount of investigation that's necessary, given the bare allegation that was made. If it was in, like, many of the cases that are cited throughout the briefs, I saw the suspect on that address 10 minutes ago putting drugs into his car. I saw him dealing drugs this morning. Okay, fine. You've got enough. You've got enough to go on. But that's not our case. And then that the officers were not allowed to investigate further on the basis of a harried woman who disappears, says, I saw that man with a gun. They don't ask her questions to assure her identity. What are they supposed to do? He was walking. They asked him to stop walking. He didn't. Yes. Then they put their hand on him and said, hey, we want to talk to you. What, then, are they supposed to do beyond that? At which point? Because there's a couple of different decision points there. The point where they stop him and say, we want to talk to you, and they frisked him. Yes. You know, in going back and doing the briefing and preparing for argument, I went back, I read Terry again, and I read Florida v. Jail again, and I thought Justice Harlan's concurrence in Terry was very interesting. I think it's borne out in the court's later jurisprudence, especially in Florida v. Jail. He says, a police officer cannot walk up to someone and insist on frisking them for weapons if he reasonably believes the person is armed but does not reasonably suspect a crime. So what's the crime that he's being suspected of? The answer to that is the answer to your question. If he is believed to be engaged in a crime or about to commit a crime or just having committed a crime, sir, we'd like to talk to you. Do you have any weapons on you? Do you mind if we check for weapons? That's what they're supposed to do, and that's not what they did. Instead, they walked after him. Stop. Actually, what the officer said was, stop, you're being detained. That's what Officer Cunney said. Stop, you're being detained. As he was free to do, Mr. Mackey continued walking because the officers, as far as he was concerned, had no reasonable suspicion to detain him for a crime. He's free to walk away, and that choice in and of itself does not provide a basis for further suspicion, particularly because they had no basis for suspecting him of committing a specified offense. Could I get a question to follow up on your argument that there were two officers? Yes, Your Honor. You're suggesting that one of them could have stayed behind while the other was in pursuit. How reasonable is that in the actual circumstances? In other words, how much time transpired so that one officer could stay behind, ask a partner, never mind? Yes, good question. The entire encounter took place over three minutes, and what Officer Cunney said was that Mr. Mackey was about 15 feet away from him, faced away from him at the time, so they were fairly close by, and it seems to me that it would not be impractical at all based on what we have in the record, and of course it's a fairly sparse record, to take 15 seconds to ask two more questions or even take a picture of the person's ID if they have ID, take down their note, and follow along with your partner to assist in what might be a detention but might not be. So I think it's, on these facts, it's entirely possible and plausible that that would be a legitimate thing for the police to do procedurally under those circumstances. I see I'm running low on time, so unless the Court has other questions, I'd like to reserve some time for rebuttal. Fine, let's hear it. Let's do the other side, and you've got time. Thank you very much. Good morning. May it please the Court. My name is Philip Kofcinski, and I represent the United States. A reasonable suspicion is a low threshold. It is considerably less than probable cause, and it is that way by design. Terry stops are an investigatory tool that are critical to police officers and their public safety function. This Court has commented on that most recently on Bonk in the Valdez-Vega case, where the Court wrote, quote, protection of the public safety justifies such an approach. That is, Terry stops. That was implicit, if not explicit, in Terry, so that didn't advance the ball much. The question is, in this context, why would it be a justifiable stop? If there was no evidence otherwise of a crime. In Terry, the cop was a beat cop. He observed these guys hanging around a jewelry store, so there was lots of indications that they may be about to break in or rob this, burgle this jewelry store. Counsel's argument is, you have a word of a distraught woman that this guy has a gun, and that's it. Now, what's your response to what the crime is? Your Honor, the crime is any number of crimes. Of course, as I'm sure you know, under Terry, the Supreme Court has actually said that identifying one precise crime is not the question here. It's rather, is criminal activity afoot? So that's a little more general. But any number of crimes here, possession of a firearm, it could be a shooting. That's, of course, illegal. It could be possession in any number of ways under San Francisco city and county law. It is illegal to have a gun on county property. That includes you in Plaza. So this incident took place very near there. It is illegal to have a gun concealed without a permit. It is illegal to open carry, period. Subject to a few exceptions that I think certainly wouldn't apply in downtown San Francisco. The defense has mentioned the idea, well, maybe the gun is in the car. Well, that's illegal too, unless it's locked up in the proper way and unloaded. But California and San Francisco in particular have extraordinarily restrictive gun laws. That is a matter of public law. That's not something that needs to be in the record. San Francisco's policy on granting concealed carry licenses is to some extent a factual issue. But that's a public document that I suppose the Court could take judicial notice of if it felt necessary. But so much of this is public law that we don't think it's necessary. This Court has addressed these issues in a number of cases. There was, of course, Peruta, if I'm saying that right, which, Your Honor, I know you wrote the opinion in that case. That's a concealed carry case, not specifically San Francisco. But that case, among so many others, talks about how California maybe leads the nation in terms of restrictive gun laws. And so that distinguishes this case from so many others that the Defendant cites. So many of those other cases, there's one out of Puerto Rico, one, I believe, out of Georgia, other States, other sets of laws. In California and in San Francisco in particular, firearms are treated differently under the law. Ginsburg-McGillivray, which you relied heavily on Sierra Hernandez and Palos Marquez to justify the officer's reasonable suspicion in this case, but in both of those cases, the informant saw a crime. Yes. And Judge Breyer thought about that issue. Here, this happens so quickly. The woman runs into the street, into traffic. That's the testimony. In a high-crime area. In a high-crime area. One of the officers said that this stretch of Golden Gate is a, quote, highway of crime. This woman runs into the street. She's agitated and concerned. That's the officer's testimony, which Judge Breyer says is, quote, entirely credible. And she says, that guy's got a gun. And the testimony is that she is screaming that. So Judge Breyer said he thought it was implicit in her statement as well as the circumstances, the manner in which she says it, that she had witnessed the gun and or knew something bad was about to happen. Are you arguing for an excited utterance? Judge Breyer, Your Honor, it's funny you say that. Actually thought about that issue and said, if this was a trial, this statement is admissible as an excited utterance. And this Court, as well as the Supreme Court, in several cases, including Navarette, has said that a tip made under the stress of excitement caused by a startling event weighs in favor of the caller's veracity. In Navarette, it was a phone caller. Here it's in person. And, Your Honor, the Sierra Hernandez case, the Palos case, those cases talk about how in person is inherently more reliable, because the police can lay eyes on the person. And so here there was some sort of suggestion or argument from the defense and the maybe this woman is hallucinating. There are mentally ill people in this neighborhood. Yeah, I've seen a few. We all have, including Judge Breyer. Of course, he's familiar with the neighborhood, too. And the police officers talked about that, both of them. They said, any reason to think she's mentally ill? No. Any reason to think she's on drugs? No. That's in the record, at least a page of questioning with both officers. So that's, again, central to what what officers are supposed to do in this circumstance is judge her credibility. And they both testified that they felt after hearing that tip, they had two options. They could stay and continue to question her and potentially let the suspect get away. Or they could pursue Mr. Mackey. And they chose to pursue Mr. Mackey. Why did you say two of them to pursue? Counsel argues one of them could have stayed behind checking out the veracity while the other went after Mackey. So both officers said on that point that when a gun and a potentially dangerous situation is involved, they have to work in pairs as a matter of their own safety. Um, they did instruct the woman to stay put before they both left to go after Mr. Mackey. They came back and she was gone. But frankly, that's not uncommon in these cases. That's the same thing in Sierra Hernandez. It's the same thing in Palos. There's a third or 11th Circuit case. I believe that we cite in our papers heard, um, United States versus her. That's a recent case where the tipster had disappeared. That happens, but it does not diminish the fact that this woman had to come face-to-face with the police, face the potential of consequences if she was lying, uh, and allow the police to evaluate her credibility. And they made a judgment to both pursue Mr. Mackey together. A couple other quick points. I do think it's worth remembering also that this case does not end with that tip. These cases are always the totality, right? They're always the whole picture. So here, the officer's testimony, which the district court says is entirely credible, is that as the woman is reporting to them, Officer Cunney locks eyes with Mr. Mackey. Mr. Mackey looks concerned and then walks briskly away. Now, Judge Breyer did not make a finding about whether as that happens, Mr. Mackey is standing put or already moving. Nevertheless, the officer said after they received the tip, Mr. Mackey was clearly walking away briskly. They follow Mr. Mackey. They say, stop. Mr. Mackey looks over his shoulder and keeps going. The officer said they believe it's certain that Mr. Mackey heard them, yet he disregarded their order to stop. Those are all additional facts that can go into the mix. This Court in United States v. Smith, of course, the Supreme Court and Houdari D. in other cases, has said if a defendant disregards an order to stop, that is, again, that evasiveness is something that can go into the mix. So all of these different facts, we think, amply show that they had reasonable suspicion to investigate. And, of course, when they did, they frisked him and found a loaded semi-automatic pistol. If the Court has no further questions, we ask to affirm. Okay. Thank you. Thank you very much. Thank you.  Thank you, Your Honor. I just want to make a couple of points regarding the record, and if the Court has questions, I'm happy to answer them. Officer Cunney did mention that he had a lot of familiarity with people in the neighborhood acting nervous and panicky and running into the street, and so that this was not an uncommon experience that he had. And, frankly, anyone who walks around that neighborhood has that experience on a regular basis. So I think that's relevant to his evaluation. Counsel for the government says it could have been any number of crimes, which is also what Officer Lucia said. In other words, he had no idea. He had no idea. It's pure speculation. It's a hunch, which is exactly what is not permitted. There has to be some amount of articulable facts agreed. It doesn't have to be cited chapter and verse as to exactly what penal code section is being violated, but there has to be some sense of exactly what the illegality is at large. And then, finally, as I... Counsel, the fact that there may be a variety of violations for having possession of a gun is sufficient evidence of a criminal potential. Yes, Your Honor. And, well, two responses to that. One is that Officer Lucia said it could be a robbery, it could be drug trafficking, it could be any number of crimes, but in other words, nothing that was directly related to the possession of a gun necessarily, because that's not in the record. There was no testimony by the officers that the drug dealing that occurs on this corner is armed drug dealing, that drug dealers always have illegal weapons on them, et cetera. But the second part of your question, or the second part of the answer to your question is, what is the illegality if there's an allegation of a gun? That's the problem, is that we don't know, which is why I raised the... Well, except we did get an answer that was left kind of hanging. If it's a concealed carry, then he needs a permit, and the likelihood of a concealed permit is not very high. If it's open carry, it's almost certainly forbidden. So when you're saying, well, he couldn't tell because his back was turned, well, but the only alternative there is open carry, for which is even less likely to be illegal. Assuming that the gun is on his physical person, which was not established by the TIP. Well, the TIP says he has a gun. I take that to mean it's on his person. I mean, that's a reasonable interpretation. It is one reasonable interpretation. But that's where state law comes into effect. In the cases I cited from various other circuits, is there a presumption? There isn't a presumption, as opposed to other states, that certain kinds of possession is illegal and has to be an affirmative defense under California law. It's true that it is restrictive. There's no question about it. All the more reason to get one more piece of information. Did you see it on his person? Was he carrying it out in the open? Yes. Okay. Let's go get him. Thank you. With that, I submit. Thank both sides for very good arguments. United States v. Mackie. Submitted.
judges: D.W. Nelson, W. Fletcher, Fisher